Okay, the next case on the docket is 514-0503, Estate of Mildred Burns v. Consolidated Coal Company. Ms. Cook, would you like to proceed? Please proceed. May it please the Court. My name is Ashley Pena Cook, and I represent the appellant, the Estate of Mildred Burns. Mildred Burns was the widow of Thomas Burns, a lifelong coal miner, who died on May 7, 2002. Mrs. Burns filed her claim for death benefits in March of 2005. Mrs. Burns died in January of 2006, leaving as her heirs a daughter and a son. On April 12, 2009, the arbitrator found the Estate of Mildred Burns and proved that the decedent suffered from CWP and COPD arising out of and in the course of his employment as a coal miner with Consolidation Coal. The arbitrator awarded benefits in the amount of $496.24 per week. The majority of the Commission affirmed and adopted the arbitrator's decision, awarding a total of $97,918.47. On July 1, 2011, the Circuit Court vacated the award, and on September 26, 2012, the Appellate Court reversed the Circuit Court and reinstated the Commission's decision. Consolidation Coal then issued a check in the amount of $89,865.30, including interest, deducting an alleged $23,386.30 credit. On November 5, 2013, we filed an application for judgment under Section 19G of the Illinois Occupational Disease Act, requesting unpaid principal in the amount of $7,980.15 plus interest and attorney's fees. This is an appeal from the Circuit Court's order granting the Respondent's motion to dismiss pursuant to 2619 and denying the Estate of Mildred Burns' application for judgment pursuant to 19G. The primary issue before this Court this morning is a question of fact. It concerns an employer who has refused to pay a Commission award pursuant to 19G. The standard of review is against the manifest weight of the evidence. Section 19G provides that a party may present a certified copy of the arbitrator's award or the decision of the Commission to the Circuit Court, and the Court shall enter a judgment in accordance therewith. It further provides in cases where the employer refuses to pay compensation according to the final award, the Court will also tax as costs against the employer any reasonable costs and attorney's fees in the arbitration proceedings and in the court hearing. Let me ask you a question about the standard of review. I mean, isn't a primary issue here whether or not a claim for set-off can be raised in a 19G? This all has to do with Section 19G and the Court denying it. I mean, that issue would be a question of law, wouldn't it? We would review de novo whether or not a set-off can be claimed at all in a 19G proceeding. We're claiming it's against the manifest weight of the evidence in this case. I'm throwing you a softball here. According to the case law. Okay, all right, go ahead. The judgment must be entered without court questioning the Commission's decision, even if the Court disagrees. The purpose of this section is to permit speedy recovery of the judgment. The only defense here is a tender of full payment of the final award. Here, the Commission awarded $97,918.47. Consolidation Coal issued a check in the amount of $89,865.30 after taking out a $23,386.30 credit that they claim they have. The Court in Vitale v. Home Depot stated that although an employer may ultimately obtain the credit granted by the arbitrator and Commission, it is not entitled to under Section 19G. Credit does not equal compensation. This is similar to this case. The Court also in Karastamis and Illinois Graphics stated that Section 19G does not enable an employer to recoup benefits paid to an employee. Rather, it's a common law action. Consolidation Coal did not claim any credit or offset before any tribunal at any level in this case. The problem that we have in this case is that the trial court interpreted federal law in the state court and essentially evaded the federal process. Here, there are specific rules and guidelines that are set out by the federal statutes which were enacted by Congress for the Federal Black Loan Act, which tells exactly what should happen should they think there was an overpayment. And those are covered in the CFRs. The Department of Labor here would establish whether there was an overpayment, the amount of the offset that they would get back, and they would have to provide notice to the coal miner. So in this case, what should happen if they are claiming that they have an overpayment instead of coming up with an arbitrary number, which is what they did here with the $23,000, they would have to contact the district. Well, the $23,000 isn't an arbitrary number. There's really no dispute here about the amount that was paid under the federal claim. Well, according to the law, it really is an arbitrary award because what really happens in the federal system, once it goes there, the federal system determines how much the amount would be, and they take into account a lot of different things other than just dollar for dollar. It's not dollar for dollar from state to federal, so you can't just look at it, and that's not how. That's not how it would be decided if they went to the federal? Yes, that's typically not how it's done. The lawyer from the coal mine would contact the district director's office, which is in Columbus, Ohio. They would file their notice. The records would be reviewed. They would determine whether or not there was an overpayment, and then they would give notice to the miner that they would need to pay it back. Specifically, Section 20 CFR 725547B states that no operator, which here would be a coal company, can make or recover an adjustment without prior application to or approval by the office, which shall exercise full supervisory authority over the recovery or adjustment of all overpayment. So what you're saying is, I guess what I'm saying is there's no dispute. I mean, what they claim for their offset or credit is the amount they paid federally. What you're saying is if they go through the federal procedure, they may not get all that because there are other criteria. That's correct. There's a question as to how this number was come up with, whether the federal court would even agree with that number. It's just a number that was come up with, and that's just not how it's done in the federal system. And clearly, they had no authority for what they did here, period. They just came up with a number. They're trying to offset it against a claim that's not what should have been done. This is a bad policy for future cases, allowing trial courts to approve setoffs that are agreed upon, potentially agreed upon by clients. Additionally, in this case, we do not agree that there was an agreement at all. There's no written documentation. It was an alleged agreement made between a lawyer who's no longer with our firm and a defense attorney. The client states that she was not aware of the setoff. She did not agree to it. The attorney- And there's no writing, as I understand it. No, ma'am. There's no authorization by the client. No. Is there any communication that's evident between the former attorney with your firm and the defendant? We do not have anything within our record. They claim that they had sent letters to the office saying that there was a setoff, but there's nothing between the former attorney and the client. And, in fact, our client in the trial court testified that she did not know what a setoff was. She didn't understand what that even meant, that she was unaware of anything regarding a setoff. So we are claiming that there also is, in addition to this, there is no agreement. There was no express authorization. Did your firm have a custom and practice with the defendant in doing this? I mean, in light of the fact that your firm does this all day long, in and out, was there a custom and practice that there was some agreement with the firm? I'm not aware of how. The attorney who was on this case is no longer with us, so I'm not sure what his custom was. But your firm would know. As far as what I know, I'm not aware of how they handle that. I'm not party to that. Mr. Cooper testified that that was the way it was usually done. He did. He's no longer with the firm. He left under bad terms. There's litigation currently involving him leaving. But, at any rate, your client disputes that there was consent for authorization. Yes. The other issue in this case is that there was a judicial admission that was made in the circuit court proceedings. The defense attorney here stated that there was no agreement. She specifically said, I don't think it is an agreement. That is a judicial admission, and we agree. If she says, I don't think it's an agreement, that's an admission? Yes. Or is she admitting that that's not what she thinks? We don't think Marissa's a fraud. It's not very probable. We believe that that makes it her state that it is not an agreement. She's absolutely right. It's not an agreement because they picked an arbitrary amount that is against the federal rules, and our client also does not agree to this amount, or that it was even discussed with her. Thank you. Are there any other questions? I ask the court to reverse the circuit court and enforce the 19G application for judgment. Thank you. Okay, thank you. We'll change the argument. For consolidating the coal is Ms. Zinn. Say it again? Oh, Interbiot. Nice. Okay, thank you. May it please the court, my name is Carolyn Interbiot. I represent Consolidation Coal Company in this appeal of the 19G decision issued by the circuit court. There is a credit of $23,386.30 that was issued pursuant to federal benefits to Mrs. Burns for the death of Mr. Thomas Burns. You were advised that there are other issues that are taken into consider in an offset. In a death claim, the only issue is the amount of attorney's fees. They take the attorney's fees off the total amount of the award. And if the amount in the state case is in excess of what is paid in the federal, it is a dollar-for-dollar set-off. And you didn't claim an offset for the attorney's fees? No. She testified that she got at least $60,000 of the $89,000 that was paid. So the $60,000 and the $23,000 is an automatic offset. Now, where Ms. Cook is talking about is there are other factors. That also offsets in living minors' claims. And say somebody settles a case, 25 percent man is poor. They figure out how much that would be for his lifetime, so it would be a $60, $70 set-off towards the $600 payment that's being made in the federal state. So there are other factors that are looked at, but that's only in a living minors' case. In a death case, you're dealing with a very finite period, which in this case ran from June 7, 2002, until January 18, 2006, which was the time that Mr. Burns died and the time that Ms. Burns died. The benefits that were issued in the federal system were from June 2002 to December 2005. And the award that was made in the state case was from the actual date of death for each of the members. Two-and-a-half weeks difference. Exactly. Well, the awards in federal, they're paid monthly. The awards in state are paid weekly. So you're obviously getting a lot more money for the death claim paying out in Illinois than you would under the federal benefits, without a doubt. With that said, we had both claims going at the same time. Sandy Fogle was representing Mrs. Burns in the federal case. Mr. Cooper was representing Mrs. Burns in the state case. The ALJ issued an award of benefits in both cases, the minor and the widows, in the federal. That was affirmed by the BRB. The affirmation by the BRB came after Mrs. Burns' state claim was tried in front of the arbitrator. They made the comment that we didn't ask for the credit in front of the arbitrator. There was no way we could ask for a credit. When you ask for a credit for what you've already paid, we haven't paid anything. CISPRO would completely say this is a speculative claim. At the time of arbitration, you had. Exactly. And you can't bring it up in front of the commission. It's got to be an issue that you put in front of the arbitrator. So, I mean, there was no way to ask for it. So what we did in January 2010 when we said, okay, the BRB's done this, we sent the correspondence to counsel at Cullin, Missouri, said, hey, we're paying this. We have our fees and stuff that was for the minor, and then we have the stuff that was for Mrs. Burns. And it came to $23,386.30. This is what we're asking for in offset. There's communication that's in the record that was written to Ms. Fogle that was actually copied to Mr. Cooper because Mr. Cooper worked in the Harrisburg office. Ms. Fogle works in Carbondale. So they were all aware that this offset was going to happen when we got to the state case. Roman and I agreed to it. Mr. Cooper and I agreed to it. This is what we do because otherwise when we get to the end of the appellate court saying, no, she deserves her benefits, pay the woman her benefits, we go back. It goes to the district director who figures out, yes, it would be this $23,000 because there's nothing else it could be because she's obviously getting substantially more from Illinois than she ever would have gotten in the federal. They certify that to district court, and we then have to turn around and sue their client in district court to get the money back that was paid five years earlier. And that's why the agreement has always been between the firms. It's like we don't want to sue their client. They don't want their client sued. There's no doubt that what happened here in the trial court would be more expedient, and it makes a lot of sense, and all those kind of things. But what about Patel v. Home Depot? Patel v. Home Depot was a case that involved the Home Depot paid benefits from 2001 to 2002 in TTD benefits, and they were given a credit for that amount of TTD that was paid during that period. Well, then they went back after the 19B, and they had an award for a second period of TTD, which was in all of it in 2003. They took the credit they got for the 01-02 TTD, applied it against the TTD that was awarded in 2003, and said we don't have to pay this. And that's not – it's not. They were two separate awards. Well, and I know you make that distinction, and I think you're right on the facts looking at the case and everything. But the appellate court treats it as if, you know, there was an offset that would have covered the entire amount, and they say you still can't claim that offset. But the offset, it wouldn't have because it was for two completely different periods. They don't say that in the opinion anywhere. Well, I mean, if you look at it, that's – I mean, the award in Patel was basically 01 and 02 that they were taking a credit in 2003. But if you look at the – I mean, in Worker's Comp, if you're awarded TTD from 01 to 03 and you pay from 01 to 02 and they award in 03, you obviously can't take the credit you paid in 01 and 02 towards 03. It's a full award for three years. In this case, it is the same period. It is the exact same period of time and benefits were paid. And it wasn't even one like, oh, it's an arm and a leg. I mean, they are literally both awards to Mrs. Burns for the death of Mr. Burns due to pneumoconiosis. A Home Depot case says you can't claim an offset in a 19-G. I mean, that's what it says. And citing Karastamatis and Illinois Graphics, which don't – which say that an employer can't pursue under 19-G to get money back that it's overpaid. And in Home Depot, they say if you can't sue – if an employer can't sue to get money back that's been overpaid, you can't claim the offset. I mean, so it seems to me like the core question in this case is a question of law on whether or not you can claim an offset at all under 19-G. Well, what the law requires under 19-G is that payment is made – compensation is paid to, well, in this case, the claimant because it's not an employee. In this case, the claimant was paid $113,251.60. Her award in the state of Illinois is $97,918.47. It is payment for the same thing. It's not payment – I mean, there are cases where group health paid medical expenses. No, that doesn't cut it. This is literally a check, money paid to Mrs. Burns for the death of Mr. Burns, which is absolutely the whole point of why the federal statute says there is an absolute offset on it. Absolutely. Well, you could make the same argument in a commission proceeding where, say, you get credit under 8-J for payment under health insurance or something like that. I mean the money got paid. But they – the courts actually disagreed with that. There was a case – the high school one. One minute. Thank you. In Aurora East School District, that was the one where they had issued payments pursuant to group health. They got the award. Group health had paid two out of the three medical bills. And they said, no, you didn't issue a check directly to the claimant, so it's not a credit. We did issue a check directly to the claimant. She cashed the check. There's no dispute that she got $23,386.30. And, I mean, every case that is out there is distinguishable because there has never been a case where essentially it's the exact same thing and it was actual money paid by the employer to the claimant. Had there been a written agreement for the offset, it wouldn't have been a problem with the consent of the client. Your Honor, if you look at the testimony of Mrs. Dahl at that hearing, she testifies to settlement agreements and that she only talked to him one time. Her testimony was basically undermined because there were records put in that showed that Mr. Cooper was communicating with Mrs. Dahl, which was necessary to issue the federal benefits. And she's saying, no, I never spoke to him. And he's like, I talked to her between five and 12 times, a handful of times I talked to her. What we get into here is it's not a settlement. And counsel mentioned, oh, this judicial admission of an agreement. The word should have been settlement, not agreement. This was not a settlement. There was no question that if we didn't do an offset between the firms that she was going to get sued in federal court if the petitioner won the case, which they ultimately did. Well, why is that not a settlement? Aren't you settling part of the case, a portion of it, by agreeing to this offset or credit? No, because there were benefits she was due under the federal system. And she had the money. She could keep the money. And no, because her attorney said, hey, we're just going to take an offset at the end of the state, which is what I believe happened and what Mr. Cooper testified to happen. No, you keep your money that you've been given after the federal. We're going to offset it in the state if there is one. If we lose the case, there is no offset, so there's no harm, no foul, as opposed to saying to your client, I'm going to give you this money now, but don't spend any of it. Because in the end, they can sue you to get every penny of it back. Now, the reason you're arguing it's not a settlement is because a settlement has to be approved by the commission. Right. And it's not a settlement. It is an agreement. That's right.  It's an agreement between two firms. It's an agreement, but it's not a settlement. Well, and see, when she was testifying, she was saying that Mr. Cooper had called and talked to her about a settlement, which I don't think Mrs. Dahl was completely aware of everything that was going on. She was saying things that Ms. Fogle did, which didn't quite seem accurate either. I mean, I've worked with Mr. Cooper and Ms. Fogle. They're both reputable attorneys. And so, I mean, with that said, it was – she appeared somewhat confused, which obviously I think she was. I mean, the cases have been going on in her family from way back 2002 until the current. So, for her to be confused about things and who did what and who said what is not surprising because she's not a lawyer and she shouldn't have to remember all of this stuff. Well, I'm sure there's no doubt if Mr. Cooper and Mr. Wasore hadn't gone their separate ways, we wouldn't be here. This would be anonymous. Right. And that's the problem we get into is that we've always had this. And so, when you get to the end of it and they say, no, no, we can't do this, it's like, well, this is what we've always done. I mean, certainly in the event that the petition is granted, Console will have to sue the Burns family to get the money back, which was the whole point that we were trying to avoid in the first place. As for communication that may be at Culligan-Wasore, nothing was put in. They had the file. Mr. Cooper made it perfectly clear that Mrs. Burns' file went with them in the split. He didn't know what was in the file as far as communication. The file was never put in front of the court for them to see if there were any pieces of communication. In fact, we put evidence in showing that there was communication about the offset. They didn't even mention the offset when they originally filed the 19-G, even though they were fully aware of it. You know, basically, Mr. Cooper was a partner at Culligan-Wasore. He had the authority to enter the agreement with Console, which he did. It certainly is not going to be in this client's best interest to be sued after a case is done. And we are asking this court to recognize the difference between the set of facts in this case, which it's a unique set of facts, and I'll be the first to admit it. But if you read every case that has come out after a 19-G, there has always been some nuance. It was somebody else that paid or it was the wrong period. It has never been a case where the employer actually issued compensation to the person who was supposed to be getting the money on a credit. And basically, you know, Illinois has long said double recovery is not allowed. And the whole point is it's for one single injury. This is what you get, and this is how you get it. And while I'm the first to admit, you know, we did it this way to try and make it easier for everybody, and there was no question that there was an agreement. Mr. Cooper came back in and said, yes, we've always had this agreement. We had it in this one. I believe I contacted Ms. Dahl. Couldn't prove any of the communication because he doesn't have the file anymore. I mean, we paid them. And there is no question that Mildred Burns and or the estate of Mildred Burns received $113,251.60. There is no dispute on that. And her award was for $97,918.47. The difference is the interest that was awarded after it got out of the appellate court. So unless there's any other questions, we ask you to affirm the circuit court's findings that the petition should be dismissed because Consolidation Coal Company made a full payment, which is an absolute defense on the 19G, which is the only way she could have issued the decision she issued. Thank you so much. Thank you. Ms. Cooper. Defense seems to want us to take the easy way out here and just go along with everything that they had in mind instead of doing it the way that the law requires it to be done through the federal statutes. The federal statutes were enacted by Congress for the federal black loan cases to go through the process to have them determine, first of all, whether there was an overpayment, second of all, how much that overpayment is, and then also to give notice to the minor. The minor then will get money back, or the estate in this case, to Consolidation Coal. We have no problem going the correct route. We want to follow the law. We don't want to make bad law here. So you're asking, with our granting of your petition, that it's okay with you if Consolidated Coal sues your client? Well, it's not okay with us if they sue the client. However, that is the procedure that would be done. If they choose to go down that road, that's fine. And you understand that? We understand that that's the way that we have typically done these cases in the past. This is not an unusual situation where they come back and get money from the minor. That's why the laws are set up in the federal system to provide for this type of a situation, and to determine whether there has been an overpayment. What about your prior argument that there were all these factors, and your argument that this is a death case and it's very straightforward, dollar for dollar? Who's right on that? Well, it still doesn't make a difference. You still have to go— Well, who's right? I'm sorry? Who's correct on the law? I believe that I'm correct on the law, that you still have to go through the federal system. That's not what I'm asking. It's a dollar for dollar set up in a death case. No, it is not. It goes through back to the federal system. They determine the amount of—if there is an offset, then they determine, based on whatever calculations that they use, how much money would the minor then need to give back. So we do not believe that it is a dollar for dollar set up. And here, the issue that we're specifically dealing with is that 19G, again, that the court must enter a judgment of a final order of a commission. Here, that was not done. Consolidation Coal took off $23,000, and some—what, more money? I don't know the specifics. That's okay. I'm good. But—and so the court must enter the judgment on a final order of the commission, period. The only defense is full payment. That was not done here. It does not matter what she's arguing with the $113,000. We are arguing that the commission ordered $97,000. They paid us $89,000. They have no defense to this partial payment. It's not sufficient. Additionally, there's no agreement based on any supposed improper agreement to take a set up. This alleged agreement defeats specific statutes that are enacted by Congress to address these issues exactly. The Department of Labor, not the defense attorney, must establish whether there's an overpayment, the amount of the overpayment, and then provide notice. There was no express authorization by our client, as we discussed. And the counsel has conceded at trial by judicial admission there was no agreement. Defense counsel mentioned that Mrs. Dodge probably had a hard time remembering everything that went on with this case because it happened for so long. Well, one of the reasons why you would have a written documentation is so that she wouldn't have to remember everything. That's why it's so critical here that there was nothing written. There's nothing in our records. We've gone through our individual records. We're not holding anything back. There's no written express information anywhere from the lawyer, the former lawyer of our firm, to the client. If there's no further questions, we ask that this court reverse the circuit course and court enforce the 19G application for judgment. Thank you. Thank you very much. Okay, this matter will be taken under advisement and a disposition will be issued in due course. That will conclude the meeting session. The court will be in recess.